### No. 39,544

STATE OF KANSAS, ex rel., HAROLD R. FATZER, Attorney General of the State of Kansas, *Appellant,* v. I. MILLER, JR., a/k/a IRVING MILLER, d/b/a MORGAN AND COMPANY; MODERN FINANCE CORPORATION, MORGAN AND COMPANY and WILLIAM S. WORFORD, *Appellees.*

(279 P. 2d 223)

Opinion filed January 22, 1955.

*Thomas M. Evans,* assistant attorney general, argued the cause, and *Harold R. Fatzer,* attorney general, *Paul E. Wilson,* assistant attorney general, and *Ward D. Martin,* special assistant attorney general, were with him on the brief for the appellant.

*E. E. Sattgast,* of Wichita, argued the cause, and *John Madden,* and *Louis W. Cates,* both of Wichita, were with him on the brief for appellee Modern Finance Corporation.

*Tom Harley, Jr.,* of Wichita, argued the cause, and was on the brief for appellee William S. Worford.

The opinion of the court was delivered by

THIELE, J.: This was an action commenced on August 5, 1953, by the state of Kansas on the relation of the attorney general to permanently enjoin certain named defendants from lending money in this state at a rate of interest greater than that permitted by the laws of this state and from carrying out alleged plans and conspiracies designed to accomplish such a purpose.

No service of process was had on some of the defendants.

We pass by a series of motions to add parties defendant, to quash service of summons, and note that defendant Worford filed an answer alleging that the petition failed to state facts constituting a cause of action against him and denying generally the allegations of the petition, and that the defendant Modern Finance Corporation, generally referred to hereafter as the corporation, filed an answer denying generally the allegations of the petition and specifically that it had any interest in the business alleged to be Morgan & Company on September 23, 1953, or at any time thereafter and alleging that on September 8, 1953, it sold all of its interest and all of its assets in Kansas and particularly in the business alleged to be Morgan & Company, and other matter not necessary to be detailed here. Attached to its answer was a copy of a bill of sale purporting to sell its assets to one George O. Ray.

On the issues so joined a trial was had on February 10, 1954, at which oral and written evidence was produced and argument had. Thereafter on March 16, 1954, the trial court made findings of fact and conclusions of law, as follow:

## "FINDINGS OF FACT

"No. 1. The Court finds that Harold R. Fatzer is the duly elected qualified, and acting Attorney General of the State of Kansas.

"No. 2. That the defendant, Modern Finance Corporation is a Delaware corporation, with its principal place of business in Nashville, Tennessee, and admitted to do business in the State of Kansas.

"No. 3. That the Modern Finance Corporation operated an office known as MORGAN & COMPANY at 212 East First Street in Wichita, Kansas.

"No. 4. That the defendant, WILLIAM S. WORFORD was the manager of the office of Morgan & Company here in Wichita, and continued in that capacity until the early part of January, 1954.

"No. 5. That the method of operation was as follows: The borrower or customer, would go into the office of Morgan & Company at 212 East First Street, Wichita, Kansas, and ask for a loan;

"That if Morgan & Company thought that the borrower or customer was a good risk, then the borrower would sign a note in the form of State's Exhibit 1, the note being in the amount of the amount of (sic) money received by the customer plus interest at 8%, with a minimum charge of 55 or 60 cents.

"That this note was endorsed by Morgan & Company in substantially the following form:

'Payment of this note is fully guaranteed by Morgan & Company' and signed by one of the employees of Morgan & Company.

"That at the same time, an instrument similar to State's Exhibit 2, being designated as customer's draft, was drawn on the American Bank & Trust Company a corporation, organized and existing under the laws of the State of

Louisiana, and authorized to do a general banking business with its principal place of business at Baton Rouge, Louisiana, in the amount of the money received by the customer or borrower.

"That the draft, in addition to being signed by the borrower, was also endorsed on the back by the borrower, and endorsed by Morgan & Company.

"That at the same time, the borrower or customer would sign a brokerage contract substantially in the form of State's Exhibit 3.

"*That at the time of the signing of the note State's Exhibit 1, it was in blank with the exception of the amount.*

"*That the draft was in blank with the exception of the amount.*

"*That the brokerage contract was in blank.* (Emphasis supplied.)

"That upon the completion of the signing of these instruments, the customer or borrower was paid the money in cash from the petty cash fund which was money belonging to Morgan & Company or Modern Finance Corporation.

"That from the time the borrower or customer entered the place of business of Morgan & Company and made his request for money that he received the money within ten minutes and that no phone calls were made by an employee of Morgan & Company or Modern Finance Corporation, and no employee left the office of Morgan & Company. That the entire transaction was completed at one time and the borrower or customer received the money over the counter out of the petty cash fund at the office of Morgan & Company.

"That at the time a customer or borrower would make application for a loan at Morgan & Company, no oral statements were made to the customer or borrower by Mr. Worford or any other employee of Morgan & Company to the effect that it was necessary for Morgan & Company to obtain the loan for the customer or borrower from a third person, more particularly the Louisiana bank.

"That at the close of the business of that day Morgan & Company would send to the American Bank & Trust Company, the completed note, the completed customer's draft which, when received by the American Bank & Trust Company at Baton Rouge, Louisiana, the bank would then issue its check covering the face amount of the draft to Morgan & Company and remit the same to Wichita.

"That the brokerage contract was completed and retained by Morgan & Company or Modern Finance Corporation.

"No. 6. That the Bank in Louisiana received no money other than the face amount of the note, which included the amount of money loaned, plus the interest.

"No. 7. That the Bank did not share in any of the other monies paid by the customer or borrower to Morgan & Company.

"No. 8. That in addition to the notes forwarded to the Louisiana Bank by Morgan & Company, the bank was secured by 80 to 85% of the money loaned on these notes. The security being government bonds or other securities deposited with the Louisiana Bank by Modern Finance Corporation in an amount equal to 80 to 85% of the total of the face value of the notes.

"No. 9. The Modern Finance Corporation or Morgan & Company did not receive or share in any of the interest paid to the bank.

"No. 10. That the money obtained by the customer or borrower was paid in periodic installments at the office of Morgan & Company, 212 East First Street, and the money paid was forwarded to the Bank in Baton Rouge, Louisiana, to be credited upon the note until the note was paid in full with interest. That in the event of default upon payment of the note, the note was paid by Modern Finance Corporation or Morgan & Company.

"No. 11. That all monies paid over and above the face amount of the note, including the interest, were retained by Morgan & Company or Modern Finance Corporation, and the Bank did not share in these monies.

"No. 12. That Modern Finance Corporation leased the property located at 212 East First Street . . ."

Nos. 13, 14 and 15 pertain to an effort by Modern Finance Corporation to dispose of its assets in Kansas after the instant action was filed.

"No. 16. That the money paid by the customers or borrowers to Morgan & Company, or Modern Finance Corporation, if determined to be interest, that is, the money paid over and above the amount of money received by the customer or borrower, is determined to be interest, that interest rate would be between 156% and 387% per annum.

"No. 17. That numerous transactions of the nature hereinbefore described were made by Morgan & Company at the office 212 East First Street from sometime in 1952 to the early part of January, 1954.

"No. 18. That at no time did Morgan & Company or Modern Finance Corporation act as the agent for the American Bank & Trust Company.

"No. 19. That at the time the borrower or customer paid his account in full the notes or brokerage contracts were not returned to the borrower or customer, but the borrower or customer received a receipt showing 'Paid in Full,' at the time the last payment was made, and that the borrower or customer did not request the return of the note marked 'paid' nor the return of the brokerage contract, but the Bank would have returned the cancelled note, if requested.

"No. 20. No conspiracy existed in these transactions between the bank and Modern Finance Corporation or Morgan & Company.

"CONCLUSIONS OF LAW

"No. 1. That the attempt on behalf of Modern Finance Corporation to sell their assets in the State of Kansas, including Morgan & Company . . . . is of no legal effect and therefore has no bearing upon this lawsuit.

"No. 2. That the brokerage fee charged in this case is legal under the doctrine laid down in *Lynn v. McCue*, 94 Kans. 761, syl. 5, and corresponding part of the opinion at pages 772-773 that the brokerage fee is not interest as provided for in Section 16-202 G. S. 1949.

"No. 3. The problem of the companies making small loans has been before the Legislature at every session in recent years, and the legislature has not seen fit to change our usury law.

" 'Courts are not concerned with Legislative policy or the wisdom thereof. Their function is to ascertain the Legislative will and to make it effective if

reasonably possible to do so.' *State, ex rel., v. Russell,* 171 Kans. 709 at page 712.

"No. 4. Application for permanent injunction is denied and judgment is rendered for the defendants for costs."

Thereafter the trial court rendered a judgment that the injunction prayed for be denied and that judgment be entered for the defendants for costs. Following the judgment the plaintiff filed its motion to set aside Finding of Fact No. 20 and Conclusion of Law No. 3 and its motion for a new trial, and the corporation filed its motion that the court set aside certain rulings made March 16, 1954, and for a new trial and later another motion to strike the word "attempted" from its Findings and its Conclusion of Law No. 1. On March 30, 1954, the trial court denied all post trial motions and on April 10, 1954, the plaintiff perfected its appeal from the judgment of March 16, 1954, from the rulings on its post trial motions and from all adverse rulings. The appellees filed no cross appeal with reference to the trial court's conclusion of law No. 1 and it will not be noticed further.

The appellant in due time filed its abstract of the record specifying as error that the trial court erred: 1. In finding that at no time did Morgan & Company or Modern Finance Corporation act as agent for the Louisiana bank; 2. In its conclusion that the brokerage fees charged and collected were legal; 3. In its conclusion that the brokerage fees charged and collected were not interest under the law of this state; 4. In its conclusion that the loans and transactions were not in violation of the usury laws of this state; and 5. In its denying the injunction prayed for and in entering judgment for the defendant.

The appellee corporation thereafter filed its motion that the appeal be dismissed by reason of the failure of appellant to specify as error the ruling on its motion for a new trial. On December 3, 1954, we denied the motion with permission for the corporation to renew it on the hearing on the merits and the corporation has done so. We have repeatedly held that errors relating to matters occurring at the trial, and for which a new trial was asked, cannot be considered on appeal unless the action of the trial court in overruling the motion is specified as error. See *McCarty v. Kansas-Nebraska Natural Gas Co.,* 176 Kan. 386, 389, 271 P. 2d 264, and numerous cases cited. Conceding for present purposes that the first specification refers to a matter that should have been presented

by a motion for a new trial and that the ruling on the motion should have been specified as error, observance of the rule does not call for a dismissal of the appeal but only limits its scope. The remaining specifications of error pertain solely to questions of law, and a motion for a new trial was neither necessary nor proper as to them. An analogous situation was presented in *Marion County Comm'rs v. Clark*, 157 Kan. 132, 138 P. 2d 449, where it was said:

"Appellant is not compelled to specify error on every ruling, decision and judgment included in its notice of appeal. If it is now willing to stand on the findings of fact made by the trial court, the subsequent rulings become immaterial. In such situation we are not concerned with whether the evidence supported the findings of fact or warranted other findings, or with rulings on evidence, and such other matters as would ordinarily have to be presented in a motion for a new trial. The sole question must be and is whether the findings of fact support the judgment rendered." (1. c. 134)

See, also, *W. K. H. Trust Co. v. Building Co.*, 160 Kan. 605, syl. 3, 164 P. 2d 143.

The motion to dismiss the appeal is denied and the questions of law presented will be considered.

Before taking up the appellant's contentions we direct attention to the trial court's finding of fact No. 5 where reference is made to *forms* of note, draft and brokerage contracts. No completed documents executed by any of plaintiff's witnesses were ever returned to the makers (court's finding No. 19) and were not received in evidence but it was stipulated that, if present, an employee of the corporation would testify that the forms were used by the corporation in carrying on its business. Attention is also directed to the trial court's finding No. 10 that the customer paid periodic installments at the office of Morgan & Company in Wichita until the note was paid in full. Smith, a witness for the plaintiff, testified that she borrowed $50.00 to be repaid in twelve weekly installments of $5.65, and there was considerable other testimony of similar nature. It was also stipulated that a witness for the corporation, if present, would testify the brokerage fee for a $50.00 loan for 90 days was $16.75, for a $10.00 loan for 60 days was $3.45 and the interest was 55 cents, and other fees for other loans. The testimony indicated a brokerage contract was signed in every case at specific amounts for loans of certain amounts and maturities and that the financial responsibility of the borrower had nothing to do with the brokerage fee.

It is here noted, without quoting therefrom, that our statutes provide that the parties to a promissory note or other instrument of writing for the payment or forbearance of money may stipulate for interest at a rate not to exceed ten per cent per annum, and for civil remedies for violation. See G. S. 1949, 16-202 and 16-203.

In its brief appellant does not take up and separately discuss its specifications of error. The gist of its contentions is that whether the transactions under consideration were usurious is to be determined by the substance and not the form of the transactions and that the findings of the court and the evidence on which they were based conclusively establish that the corporation was loaning its own money and through the devices used was demanding and receiving interest in excess of that allowed by law. The appellees, in their brief, do not follow the appellant's order of presentation, but in substance contend that the findings of fact are conclusive and not to be controverted and that the sole issue is whether a commission or charge made by a third party in securing a loan, the charge plus the interest being in excess of the amount of interest allowed by law, makes the transaction usurious. In expanding their arguments the appellant and appellees direct our attention to more than seventy decisions and a great deal of text authority, much of which is cumulative. Limits of space preclude reference to all the authorities cited.

Many authorities hold that in order for there to be a usurious contract there must be a loan or forbearance of money or its equivalent and an unlawful intent and understanding that the loan be paid, there being an exaction for the use of the loan of something in excess of what is permitted by statute or law (66 C. J. 174; 55 Am. Jur. 331, and authorities cited) and the general rule is that in determining whether a requirement that the borrower pay a commission to an intermediary or broker through whom the loan was actually or apparently negotiated, constitutes usury and not compensation for services to the borrower, the court will look through the form to the substance. (66 C. J. 174; 55 Am. Jur. 334, the annotations in A. L. R. later mentioned, and authorities cited.) The above rule was recognized and followed in *Woods v. Curry*, 109 Kan. 677, 202 Pac. 86.

The findings of the trial court have been set out. We assume that court applied the above rule to the facts so found. By its second conclusion of law it found the brokerage fee was legal under our holding in *Lynn v. McCue*, 94 Kan. 761, 147 Pac. 808. Although

other matters were involved in disposing of that case this court with respect to usury said:

"The question of usury appears to be purely one of fact. In form the original transaction between the construction company, the bank and the trust company was this: The construction company applied to the trust company for a loan of $400,000. The trust company at first considered making it, but finally refused to do so on the ground that the highest lawful rate of interest was not sufficient compensation in view of the risk involved. Then the trust company offered to procure the loan from the bank for a commission of $60,000, and the offer was accepted and carried out. To induce the bank to make the loan the trust company agreed to take it up at any time on demand of the bank, and within a short time did so. If the deal was just what it purported to be it was legitimate, the $60,000 was paid as a commission and not as interest, and did not constitute usury. (39 Cyc. 978, 980.) But if the various steps taken were a mere cover—if the trust company was the agent of the bank, or if the trust company really loaned its own money to the construction company through the bank, or borrowed the money itself from the bank and loaned it to the construction company—then the transaction was usurious. (39 Cyc. 922, 971.) There was much in the circumstances attending the affair, and in the correspondence of the parties, tending strongly to show that the bank was a mere figurehead in the matter. But this can not be said to have been conclusively proved. There was some oral testimony to the contrary, and the decision of the trial court against the claim of usury must be regarded as settling the matter." (l.c. 772)

In the later case of *Marshall v. Beeler,* 104 Kan. 32, 178 Pac. 245, the action was to recover back alleged usurious interest paid. The question of usury was discussed at some length and it was said:

"The defendant makes the preliminary contention that the bonus or commission collected from the plaintiff was not, in fact, usurious, and insists that the case of *Lynn v. McCue,* 94 Kan. 761, 147 Pac. 808, decides that where a bonus is charged as a commission for making a loan, the transaction is not usurious. The point decided was the reverse of what the defendant contends. The case was one where three parties were concerned in the transaction, a bank, a trust company, and the borrower. There was a conflict in the testimony as to whether the trust company was merely the agent of the bank, or really loaned its own money. It was said in the opinion:

" 'But if the various steps taken were a mere cover—if the trust company was the agent of the bank, or if the trust really loaned its own money . . . then the transaction was usurious.' (p. 773.)" (l.c. 33)

In our opinion it may not be said, in view of the facts found by the trial court, that its conclusion of law was either compelled by or warranted under *Lynn v. McCue,* supra, and this is especially so in view of the comment in *Marshall v. Beeler,* supra, quoted above. Factually the situation considered in *Lynn v. McCue* bears little resemblance to the facts of this case as found by the trial court.

There the trial court had found from disputed evidence that the commission for procuring the loan did not constitute usury and on that basis this court affirmed. In the instant case there was no dispute as to the manner in which the loans were negotiated and the trial court made no finding of fact the commission charged and collected did not, when coupled with the interest, constitute a usurious contract.

And we may pause here to say that the trial court's conclusion of law, that the problems of companies making small loans has been before the legislature in recent sessions and no change in the law had been made, is not to be upheld as supporting its judgment. We shall indulge no presumption that the legislature by failure to amend an act, approved violations of that act, if there have been such. Rather the presumption to be indulged would be that the legislature was satisfied with the existing statute limiting the exaction of interest to ten per cent per annum.

The fact we do not agree with the trial court's judgment for the reasons assigned does not warrant its reversal if there is other sound ground on which it may be sustained. (See e.g., *Kirkpatrick v. Ault*, 174 Kan. 701, 258 P. 2d 262, and authorities cited.) The question remains whether, under the facts found, the brokerage contract was a lawful one, or whether, under those facts, it was taken as a subterfuge to cover the unlawful exaction of interest.

There are numerous decisions of courts of last resort wherein the question was considered whether a compelled brokerage commission, a policy of insurance, the purchase of some type of security, or the like, taken in connection with a loan at a lawful rate of interest, was a subterfuge giving an apparently lawful appearance to what in fact was a usurious contract. Many of these decisions are cited in 66 C. J. 174, 55 Am. Jur. 334, and in annotations in 21 A.L.R. 797, 53 A.L.R. 743, 63 A.L.R. 823, 105 A.L.R. 795, or in the A.L.R. Blue Book of Supplemental Decisions, Perm. Vol. 2. It may be conceded that as applied to compulsory brokerage contracts or the required purchase of insurance or securities or the like there is some division of authority, but by what we conclude is the weight of authority and the sounder reasoning, especially where the rule that substance and not form governs is applied, if it is apparent that the brokerage contract, purchase of insurance or securities or like devices are only subterfuges to cover the actual transaction, the contracts are to be held usurious.

In support of their contention that the transactions had by them did not constitute usurious contracts appellees direct attention to finding of fact No. 18 that they did not act as agent for the American Bank & Trust Company, and that it must therefore be assumed they acted for the borrower. That might be a fair assumption were it not for finding No. 5 that the borrower was paid his loan from the petty cash account of the corporation which was money belonging to the corporation. If the corporation was the lender and not the agent of the bank, no question of agency was involved. Appellees direct our attention to and quote extensively from 55 Am. Jur. 373, 27 R. C. L. 236, and 66 C. J. 226-7, which treat at length that a lender cannot be charged with usury on account of any commission paid by a borrower to his own agent for services in procuring a loan. That contention need not be elaborated nor any review made of the cases cited in support for it may be conceded for present purposes that if the findings of fact made show that appellees were brokers in fact, there was no usurious contract.

In *Woods v. Curry,* 109 Kan. 677, 202 Pac. 86, the question for consideration was whether a renewal note had been increased in amount to cover a commission for procuring a loan. Although that case is distinguishable on the facts, reference being made to that opinion therefor, this court, in reversing a judgment against the maker, said:

"Of course this court will not attempt to weigh conflicting testimony. It is not necessary to do that, however, to determine the right of the matter and direct the proper judgment. While not permitted to pass upon the weight of the testimony, we are not required to stultify ourselves by ignoring undisputed facts." (l. c. 683)

What do the findings of fact of the trial court show? No. 3 shows that the corporation operated an office in Wichita known as Morgan & Company. Hereafter reference to the corporation includes the company. No. 5 shows that a borrower would go into the corporation's office and ask for a loan and if it thought he was a good risk the borrower would sign a note with interest at eight per cent, a form of a customer's draft to his own order which he would endorse and a form of brokerage contract, all of which were in blank except as to the amount of the loan, and when he had signed these documents he was paid the money loaned from the petty cash fund belonging to the corporation; that the transaction would be completed in ten minutes and during that time no phone calls were made by an employee of the corporation and no employee left the

office, the entire transaction being completed at one time; that at the time the borrower made application for a loan no statements were made by the corporation to the effect it was necessary to obtain the money from any third person. At the close of business that day the note and draft which had been completed by filling in the blank signed forms would be sent to the bank and the bank would remit to the corporation, which retained the brokerage contract. Under finding No. 10 the borrower paid his loan in periodic installments at the office of the corporation, which forwarded the money to the bank to be credited on the note until it was paid with interest, and in event of a default the note was paid by the corporation. Heretofore we have commented on the evidence supporting this finding. We add the further comment that the amount of each weekly payment multiplied by the number of weekly payments equalled the amount borrowed as evidenced by the note, plus the interest on the note, plus the commission called for by the brokerage contract which had been completed some time after the loan was negotiated and the borrower had received his loan and left the premises of the corporation. We are left to infer that the portion of the periodic payments not necessary to satisfy the note and interest, was used to satisfy the brokerage contract. We also note finding No. 16 that if the payment by the borrower to the corporation above the amount received by him was determined to be interest, the interest rate would far exceed ten per cent per annum. Although findings Nos. 6 and 7 are that the bank received nothing but the amount of the note and interest and did not share in any other moneys paid by the borrower, and findings Nos. 9 and 11 are that the corporation did not share in any interest paid to the bank and retained all of the moneys paid over the amount of the note and interest, finding No. 8 is that the corporation secured the bank by placing with the bank government bonds and other securities in an amount equal to 80 to 85 per cent of the total of the face value of the notes which represented the amount advanced by the bank. It seems somewhat remarkable and challenging that if the corporation was actually brokering the loans, it would maintain with the lender an amount of security that would guarantee the lender against loss to the extent of 80 to 85 per cent, in addition to the notes which certainly had a substantial value.

Ignoring for the moment the form of the note, completed by the corporation after the loan had been made to the borrower, the find-

ings are just as consistent with a conclusion the corporation was securing its operating capital from the bank at the same rate of interest as was specified in the notes and loaning it in its own discretion to its borrowers, as with a conclusion it was brokering the loans (notes) to the bank.

Looking through form to substance, it is clear that a borrower entering the corporation's place of business made his application for a loan, the amount of which he received from the corporation within a few minutes; that to procure it he signed three instruments in blank. He likely understood why he signed the note, but the record is clear that nothing was said the money loaned was being loaned by any third party, that a commission or brokerage fee was either required, necessary or would be paid, or that the draft which he signed in blank would later have the name of a third party inserted as drawee. Insofar as the borrower was concerned, the evidence makes it clear that all he ever expressly agreed to was the loan of money to him by the corporation which he agreed to repay in a stipulated number of weeks and in stipulated amounts.

We have no difficulty in concluding that the forms used and the methods followed by the corporation in the conduct of its business were subterfuges to give an apparently lawful appearance to what in fact were usurious contracts and that the trial court erred in its conclusion of law to the contrary.

The judgment of the trial court is reversed and the cause is remanded to the trial court with instructions to render a judgment for a permanent injunction against the defendants as prayed for and for such incidental relief as plaintiff may be entitled consistent with this opinion.

ROBB, J., not participating.